## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| **ROGER MILLER MUSIC, INC. and** ) | |
| **MARY A. MILLER,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **NO. 3:04-01132** |
| ) | **JUDGE HAYNES** |
| **SONY/ATV PUBLISHING, LLC,** ) | |
| ) | |
| **Defendant.** ) | |

### M E M O R A N D U M

Plaintiffs, Roger Miller Music, Inc. ("RMMI"), a Tennessee corporation, and Mary A.

Miller, a Tennessee citizen, filed this copyright ownership and infringement action under the

Copyright Act of 1976, as amended, 17 U.S.C. §§ 101 et seq. against Defendant Sony/ATV

Publishing, Inc. ("Sony"), a Delaware limited liability corporation. Plaintiffs are the heirs and

assigns of the Roger Miller, the late country music singer and songwriter. Defendant Sony is the

successor-in-interest to Tree Publishing Co., Inc. ("Tree"), the publishing company with whom

Miller contracted with from 1958 until his death in 1992. The gravamen of Plaintiffs' complaint is

that upon Miller's death, Plaintiffs became entitled to the renewal copyrights of Miller's musical

compositions from 1958-1964 ("the Songs"), and Sony's continued exploitation of these

compositions constitutes copyright infringement in violation of 17 U.S.C. § 501 et seq. Plaintiffs

seek monetary damages as well as declaratory relief and an accounting.

Before the Court are the parties' dispositive motions. First is Sony's motion for judgment

on the pleadings (Docket Entry No. 8), contending, in sum: (1) that Mary Miller lacks standing to

assert her independent claim against Sony; (2) that Plaintiffs' claims are time-barred; (3) that Miller

assigned his renewal copyrights for the Songs to Sony's predecessor-in-interest; (4) that the renewal

copyrights for the Songs first copyrighted in 1958-63 are vested in Sony; (5) that Sony is the beneficial owner of the renewal copyrights for the Songs, including the 1964 Songs; and (6) that even if Sony lacks any ownership interest of any kind in the Songs, Sony has not infringed because Sony is an implied non-exclusive licensee of the Songs.

In response, Plaintiffs filed a motion for summary judgment (Docket Entry No. 13), contending, in essence: (1) that Plaintiffs own the renewal copyrights to songs published pursuant to the relevant publishing agreements with Sony's predecessor-in-interest under both the terms of Miller's will and 17 U.S.C. § 304(a)(1)(c); (2) that Sony has infringed Plaintiffs' copyrights by gaining the benefit of the renewals of the Songs and is not an implied non-exclusive licensee; and (3) that Plaintiffs' claims are timely.

In its response to Plaintiffs' motion (Docket Entry No. 18), Sony makes the additional contentions that: (1) Plaintiffs' knew of Sony's continued exploitation of Miller's songs and received royalties from Sony since Miller's death; (2) Sony maintains beneficial ownership of all of the Songs and as a matter of law cannot be liable for copyright infringement or damages to Plaintiffs; (3) and Sony holds legal title to the Songs published between 1958 and 1963. In addition, Defendants concede that Plaintiff RMMI is the legal owner of the Songs published in 1964.

For the reasons set forth below, the Court concludes that Roger Miller validly assigned his interests in the renewal copyrights for the 1958-63 Songs to Sony, as Tree's successor. The Court concludes further that although Mary Miller or RMMI are the legal owners of the renewal copyright interests for the 1964 Songs, the totality of the circumstances surrounding Roger Miller's relationship with Sony/Tree, as well as Plaintiffs' continued receipt and acceptance of royalties from Sony for twelve years after Miller's death for Sony's exploitation of these Songs demonstrate that

2

Sony is an implied non-exclusive licensee of Plaintiffs' renewal copyright interests for the time period at issue. Accordingly, Plaintiffs' motion for summary judgment should be denied and Sony's motion for judgment on the pleadings should be granted.

## I. FINDINGS OF FACT

Roger Miller was a "Grammy Award-winning legend of country music. Although Miller penned and performed many hit songs, he is most famous for the still-loved 'King of the Road'." Broadcast Music, Inc. v. Roger Miller Music, Inc., 396 F.3d 762, 764 (6th Cir. 2005).

Throughout his career, Miller entered into various agreements with Tree Publishing, Co., Inc. ("Tree"), Sony's predecessor-in-interest. (Docket Entry No. 19, Defendant's Response to Plaintiffs' Statement of Undisputed Facts at ¶¶ 3, 4, 8, 23, 25, and 27). In 1958, 1960, and 1962, Miller and Tree executed publishing agreements by which Miller conveyed the original copyrights of the Songs to Tree ("Publishing Agreements"). (Docket Entry No. 1, Complaint at ¶¶ 8, 10 and 12 and Exhibits 2-4 attached thereto). The pertinent language in the Publishing Agreements is as follows:

1. Subject to the terms of this contract, [Miller] hereby sell[s], assign[s], transfer[s] and deliver[s] to [Tree] all musical compositions heretofore written and/or composed by you which have not previously been assigned to publishers other than [Tree] and [Miller] hereby agree[s] to sell, assign, transfer and deliver to [Tree] all musical compositions which [Miller] shall hereafter write during the term of this contract and any extensions and renewals thereof.

2. All rights in and to music and/or lyrics for musical compositions as soon as conceived, composed and/or written by [Miller] during the term of this agreement and any extensions and renewals hereof shall immediately be vested in [Tree] together with the right to copyright the same throughout the world.

Id. at Exhibit 2 attached thereto, 1958 Agreement at ¶¶ 1-2, Exhibit 3 attached thereto, 1960

3

Agreement at ¶¶ 1-2, and Exhibit 4 attached thereto, 1962 Agreement at ¶¶ 1-2.[1] In exchange for this assignment, Sony agreed to publish the songs and provide Miller with a share of the royalties. Id. at Exhibit 2 attached thereto at ¶¶ 7, 9, 12; Exhibit 3 attached thereto at ¶¶ 7, 9, 12; and Exhibit 4 attached thereto at ¶¶ 7, 9, 12.

The Publishing Agreements require that for each new song delivered by Miller to Tree, Miller was to execute a separate agreement to which Miller agreed "to be bound by [its] terms, covenants and conditions . . . as if herein fully set forth." Id. at Exhibit 2 attached thereto at ¶ 6, Exhibit 3 attached thereto at ¶ 6, and Exhibit 4 attached thereto at ¶ 6. This agreement, referred to as "Exhibit A", contained the following relevant language:

> 2.     [Miller] hereby sell[s], assign[s], transfer[s] and set[s] over unto [Tree] its successors and assign[s], the said musical composition (lyrics, music and title) and each and every arrangement thereof, together with the world-wide copyright thereof, and the right to secure copyright therein for the entire world, with all of their right, title, and interest, both legal and equitable therein, including but not limited to the sole and exclusive world-wide publications, mechanical electrical reproducing, transcription and motion picture rights and the right of public performance by radio, television, and other means, and all other rights now known or hereafter to come into existence.
>
> *     *     *
>
> 5.     [Miller] hereby authorize[s] and empower[s Tree] to renew, pursuant to law, for and in the name of [Miller], if living, the copyright of said musical composition, and to execute and deliver in the name of [Miller] a formal assignment of each renewal copyright to [Tree], for its own use and benefit subject to the payment of the same royalties as hereinbefore provided.

See Docket Entry No. 1, Exhibit 4 attached thereto, Exhibit A at ¶¶ 2, 5.

Over the course of these Publishing Agreements, separate "Exhibit A" agreements for new

---

[1] The parties entered into an identical contract in 1965. (Docket Entry No. 1, at Exhibit 5 attached thereto, 1965 Agreement). The songs subject to the 1965 Agreement are not subject to this lawsuit, and will not be addressed by the Court in this Memorandum. See id. at ¶ 28.

4

Roger Miller compositions were never executed. (Docket Entry No. 19 at ¶ 14). In 1969, however, "[a]s a matter of convenience for the parties," Miller and Tree entered into a separate agreement providing that: " the signing of separate agreements is hereby waived, and the terms and conditions as to the royalties and the payments thereof shall be deemed part of the main agreement and shall be made a part thereof. This covers all works heretofore written and including songs set forth in Exhibit B."[2] (Docket Entry No. 1, Exhibit 6 attached thereto, 1969 Agreement).

Miller and Tree executed their final publishing agreement on February 18, 1991. Id. at Exhibit 9 attached thereto, 1991 Agreement. The 1991 Agreement provides, in relevant part:

> 4.     (a)     Subject to subparagraphs [concerning "grand performance rights," Administered Works as defined in the Agreement, and Miller's option to administer his interests in certain songs] and any limitations contained in any other agreement to which Tree and Miller are parties, Tree shall have the sole and exclusive right to exercise and authorize others to exercise all rights and interests in and to Said Works,[3] throughout the world and in perpetuity, including all copyrights therein, and the sole and exclusive right to receive any and all benefits, advantages, income, revenues, royalties and fees of any and every nature, kind and description whatsoever, derived and derivable, accrued, or which may, might or shall hereafter accrue, in any and all parts of the world, directly and indirectly, from any and every use and purpose whatsoever of Said Works or any part thereof and from any and every contract, agreement, right, privilege, grant and license in respect thereof.

Id. at ¶ 4(a).

Miller died on October 25, 1992. (Docket Entry No. 1 at ¶ 6). In his will, Miller left all of his property to his wife, Plaintiff Mary A. Miller. Id. & Exhibit 1 attached thereto, Last Will of Roger Miller. Mary Miller, along with six of Miller's children, assigned their interests in Miller's

---

[2] Exhibit B is a list of selected songs written by Miller at the time the 1969 Agreement was executed, including many of the Songs at issue in this case. (Docket Entry No. 1, Exhibit 6 attached thereto, at Exhibit B).

[3] "Said Works", as defined by the 1991 Agreement, includes the Songs at issue in this action. (Docket Entry No. 1, Exhibit 9 attached thereto, 1991 Agreement at ¶ 1(a), (i).

5

intellectual property to Plaintiff RMMI. Id. at ¶ 7; see also Broadcast Music, Inc. v. Roger Miller Music, Inc., 396 F.3d 762, 764 (6th Cir. 2005).

As relevant to this action, the copyrights of Miller's Songs written before December 31, 1963 were renewed prior to Miller's death. The renewal of the copyrights for Miller's Songs written in 1964 vested on January 1, 1993, more than two months after Miller's death. To date, Sony has exploited the renewal copyrights for Miller's songs, including the Songs at issue in this action, has kept its share of the royalties derived from that exploitation, and has distributed to Miller, and later RMMI, the artist's share of royalties. See, e.g., Docket Entry No. 6, Answer at Affirmative Defenses 6-7; Docket Entry No. 17, Declaration of Jeffrey D. Smarr at ¶ 4 and Exhibit A attached thereto, Sony audit report.

On April 21, 1995, Sony sent to RMMI a document entitled "Report on Application of Agreed Upon Procedures Relating to Sony/Tree Music On Behalf of The Estate of Roger Miller, Apr. 30, 1979 Through Dec. 31, 1994." This document is an audit report reviewing Plaintiffs' rights to royalties in accordance with the Publishing Agreement and disclosing and underpayments to Miller and later RMMI from 1979 through 1994. (Docket Entry No. 17, Jeffrey D. Smarr Affidavit at ¶ 4 and Exhibit A attached thereto, Sony audit report).

## II. CONCLUSIONS OF LAW

### A. Standard of Review

Upon the filing of a motion for judgment on the pleadings, under Rule 12(c) of the Federal Rules of Civil Procedure, the District Court is required to consider whether the well-plead facts in the pleadings demonstrate that the moving party is entitled to the relief sought. Republic Steel Corp. v. Penn. Eng'g Corp., 785 F.2d 174, 177 n.2 (6th Cir. 1986). "For the purpose of [a party's] 12(c)

6

motion, the District Court [is] required to accept as true all facts alleged in [the plaintiff's complaint. . . . The District Court [is required] to draw all reasonable inferences from the pleadings in the nonmoving party's favor, though the Court [is] not bound by the legal characterizations [that the nonmoving party] had given to those facts." Id.

Motions for judgment on the pleadings can be granted where the facts and law so warrant. See id.; 2 Moore's Federal Practice § 12.38 (2000). As to the consideration of materials outside the pleadings is given aside from the complaint and several exhibits that were attached to it, the motion for judgment on the pleadings can be converted to a motion for summary judgment. Falls Riverway Realty v. City of Niagara Falls, 754 F.2d 49 (2d Cir. 1985).

Given Defendant's submissions of additional documents in support of its motion see Docket Entry Nos. 16 and 17, and Plaintiffs' motion for summary judgment based upon the record in this action, the Court will treat Defendant's motion as one for summary judgment.

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to

7

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.

<u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis added in part). Earlier the Supreme Court defined a material fact for

Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to

find for the nonmoving party, there is no 'genuine issue for trial.' " <u>Matsushita Electrical Industrial</u>

<u>Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. at 326. Where there has been a reasonable opportunity for

discovery, the party opposing the motion must make an affirmative showing of the need for

additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>,

874 F.2d 351, 355-57 (6th Cir. 1989). <u>But</u> <u>see</u> <u>Routman v. Automatic Data Processing, Inc.</u>, 873

F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required

showing of the respective parties as described by the Court in <u>Celotex</u>:

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

8

<u>Celotex</u>, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. <u>Sims v. Memphis Processors, Inc.</u>, 926 F.2d 524, 526 (6th Cir. 1991) (quoting <u>Kochins v. Linden-Alimak, Inc.</u>, 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.' " <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 353 (6th Cir. 1989) (quoting <u>Celotex</u> and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and] . . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting <u>Liberty Lobby</u>). Moreover, the Court of Appeals explained that:

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

<u>Street</u>, 886 F.2d at 1480 (citations omitted); <u>see also</u> <u>Hutt v. Gibson Fiber Glass Prods.</u>, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.' " (quoting <u>Liberty Lobby</u>)).

If both parties make their respective showings, the Court then determines if the material

9

factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.

* * *

> Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'</u>

<u>Liberty Lobby</u>, 477 U.S. at 248 (citation omitted and emphasis added).

It is likewise true that:

> [I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: "The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . ."

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Company</u>, 791 F.2d. 43, 46 (6th Cir. 1986) <u>app.</u> 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

10

The Court of Appeals further explained the District Court's role in evaluating the proof on

a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New International Dictionary (1986).

> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given

some references to the proof upon which they rely. Local Rule 8(b)(7)(A) and (C) require a showing

of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and

other authorities on summary judgment and synthesized ten rules in the "new era" on summary

judgment motions:

1.    Complex cases are not necessarily inappropriate for summary judgment.

2.    Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.    The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.    This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

11

5.     A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.     As on federal directed verdict motions, the 'scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.     The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.     The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.     The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.     The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

12

## B. Claims Under the Copyright Act

To establish a claim of copyright infringement, "a plaintiff must show: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.' " Ellis v. Diffie, 177 F.3d 503, 506 (6th Cir. 1999) (quoting Feist Pubs., Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)). Further, a plaintiff's action under the Copyright Act must be commenced within three years of the alleged violation. 17 U.S.C. § 507(b).

Here the threshold issue is whether Plaintiffs' claims against Sony were filed timely. If Plaintiffs' claims were filed within the three-year statute of limitations, the Court must first determine whether Plaintiffs are the owners of the renewal copyright interests for the Songs at issue, and if so, the Court must then determine whether Sony has infringed Plaintiffs' copyrights.

### 1. Statute of Limitations

A civil action under the Copyright Act must be "commenced within three years after the claim accrued." 17 U.S.C. § 507(b). A claim accrues when a plaintiff knows of the potential violation or is chargeable with such knowledge. Bridgeport Music, Inc. v. Rhyme Syndicate Music, 376 F.3d 615, 621 (6th Cir. 2004) (citing Roley v. New World Pictures, Ltd., 19 F.3d 479, 481 (9th Cir. 1994)). In actions such as this one, where a plaintiff asserts an ownership claim as well as claims of infringement, an infringement claim is timely only if a plaintiff's ownership claim is brought within the statutory period. Ritchie v. Williams, 395 F.3d 283, 288 n.5 (6th Cir. 2005) ("[A]llowing infringement claims even though a free-standing ownership claim would be time-barred[] leads to results that are 'potentially bizzare'.")

Generally, each alleged Copyright Act violation is afforded its own three year limitations period. Bridgeport Music, 376 F.3d at 621. Indeed, "[b]ecause each act of infringement is a distinct

13

harm, the statute of limitations bars infringement claims that accrued more than three years before the suit was filed, but does not preclude infringement claims that accrued within the statutory period." Id. However, while this principle applies "to causes of action by an owner against an unknown third party, in closer relationships, such as when the parties are co-authors, the statutory period for any action to establish ownership begins to run whenever there is a 'plain and express repudiation' by one party as against the other." Ritchie, 395 F.3d at 288 n.5 (citing Aalmuhammed v. Lee, 202 F.3d 1227, 1230-31 (9th Cir. 2000); Zuill v. Shanahan, 80 F.3d 1366, 1369 (9th Cir. 1996)). In adopting this approach, the Sixth Circuit "extend[ed] the current doctrine from co-authors to others in close relationships, such as those who transfer copyright ownership via contract." Id.

Here, Sony argues that under Ritchie, Plaintiffs' ownership claims, and their claims of infringement, are time-barred because Plaintiffs filed this action more than twelve years after Roger Miller's death, at which time Plaintiffs began to receive Miller's share of royalty payments from the Songs.[4] (Docket Entry No. 11, Sony's Memorandum in Support of Judgment on the Pleadings at 9).

The Court disagrees with Sony about Ritchie's preclusive effect on Plaintiffs' claims for two reasons. First, as Plaintiffs point out, Ritchie's holding applies when there is a "'plain and express

---

[4] Sony also contends that Plaintiffs' claims should be barred under the equitable doctrines of laches and estoppel. Estoppel is an equitable remedy providing "that one may not enforce rights against another when that other has materially relied on some conduct of the moving party which is in conflict with his asserted rights. Hannewald v. Fairfield Communities, Inc., 651 S.W.2d 222, 228 (Tenn. Ct. App. 1983). Laches, an equitable doctrine arising from estoppel, is appropriate "only in such cases where [because of lapse of time] the loss of evidence, death of witnesses or parties, and failure of memory resulting in the obscuration of facts to the prejudice of the defendant, render uncertain the ascertainment of truth . . . ." John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp., 715 S.W.2d 41, 46 (Tenn. 1986) (internal citation omitted). The Court concludes that, based upon the analysis and findings discussed infra, neither doctrine is appropriate in this case.

14

repudiation'" of ownership. Ritchie, 395 F.3d at 288 n.5; see also id. at 288 (holding that letter written by Ritchie, also known as Kid Rock, to the defendants, wherein "[h]e made it clear that he regarded the songs he had written as his songs . . . [and] openly claimed exclusive ownership of the . . . rights to his songs[,] . . . triggered the running of the three year statute of limitations for copyright infringement claims."). Here, although Sony has submitted an audit demonstrating proof of its and Tree's royalty payments to RMMI from 1979 through 1994, this audit does not address the issue of renewal copyright ownership.

Second, the cases relied upon in Ritchie concerned the respective copyright ownership rights of co-authors of a work, see, e.g., Zuill, 80 F.3d at 1369, and Ritchie itself was concerned the respective rights of an author and a party with whom that author contracted regarding copyright ownership. Here, neither party made a "plain and express repudiation" of ownership, and Plaintiffs are neither the author nor a party to a contract with the author. Plaintiffs' ownership rights to the renewal copyrights, if any, would arise by operation of law. 17 U.S.C. § 304(a)(1)(C). Thus Ritchie is distinguishable from this action, and therefore does not control Plaintiffs' ownership claims.

The Court is skeptical of Plaintiffs' argument the statute of limitations did not begin to run until Sony "repudiated ownership" when it filed its motion for judgment on the pleadings in this action, (Docket Entry No. 14, Plaintiffs' Memorandum in Support of Summary Judgment at 20), particularly when Plaintiff RMMI was a part of a 1981 Publishing Agreement with Roger Miller and Tree and Plaintiffs received royalties upon Miller's death. (Docket Entry No. 1, Complaint at Exhibit 7 attached thereto, 1981 Agreement; Docket Entry No. 17, Declaration of Jeffrey D. Smarr, Exhibit A attached thereto, Sony audit report). Nevertheless, the Court concludes that absent a demonstration of clear repudiation and given the fact that Plaintiffs are neither the authors of nor a

15

contractual transferee of the copyright ownership to the Songs, Plaintiffs' ownership claims, for purposes of summary judgment, are not time-barred.

As to the timeliness of Plaintiffs' infringement claims, the Sony audit demonstrates that Plaintiffs received royalty payments from Sony's exploitation of the Songs since Roger Miller's death in 1992. (Docket Entry No. 17 at Exhibit A attached thereto). Even assuming, arguendo, that Plaintiffs had no knowledge of such exploitation as of Miller's death, the audit was sent to Plaintiffs on April 21, 1995. Id. Thus, Plaintiffs were put on notice of Sony's exploitation and use of the Songs since no later than April 1995. Plaintiffs filed this action on December 21, 2004. See Docket Entry No. 1, Complaint. As a consequence, Plaintiffs' claims for Sony's alleged infringement of the Songs based upon Sony's exploitation prior to December 21, 2001 are barred by the three-year statute of limitations and should be dismissed as untimely. However, under the Sixth Circuit's holding in Bridgeport Music, each separate infringement enjoys its own limitations period. 376 F.3d at 621. Accordingly, Plaintiffs' infringement claims arising from Sony's use of the Songs from December 21, 2001 to December 21, 2004 are not barred by the statute of limitations under the Copyright Act.

## 2. Copyright Ownership

Copyrights for works created before 1978 endure for an original term of twenty-eight (28) years, subject to renewal for an additional term of sixty-seven (67) years. 17 U.S.C. § 304(a)(1). Although copyright renewal was intended initially to serve merely as an extension of the original term, Congress amended the Copyright Act so that an author could not assign his contingent interest in the renewal term. Stewart v. Abend, 495 U.S. 207, 218 (1990). "The[se] renewal terms permits the author, originally in a poor bargaining position, to renegotiate the terms of the grant once the

16

value of the work has been tested." Id. at 218-19. Accordingly, Congress enacted a method of copyright renewal that "creates a new estate . . . clear of all rights, interests and licenses granted under the original copyright." Id. at 218 (quoting G. Ricordi & Co. v. Paramount Pictures, Inc., 189 F.2d 469, 471 (2d Cir. 1951)).

> Under the current Copyright Act:
>
> In the case of any other copyrighted work . . . .
>
>> (i) the author of such work, if the author is still living,
>> (ii) the widow, widower or children of the author, if the author is not living,
>> (iii) the author's executors, if such author, widow, widower, or children are not living, or
>> (iv) the author's next of kin, in the absence of a will of the author,
>
> shall be entitled to a renewal and extension of the copyright in such work for a further term of 67 years.

17 U.S.C. § 304(a)(1)(C).

In so amending the Copyright Act, "Congress attempted to give the author a second chance to control and benefit from his work [and] intended to secure to the author's family the opportunity to exploit the work if the author died before he could register for the renewal term." Id.; see also DeSylva v. Ballentine, 351 U.S. 570, 582 (1956) ("The evident purpose of [the renewal provision] is to provide for the family of the author after his death. Since the author cannot assign his family's renewal rights, [it] takes the form of a compulsory bequest of the copyright to the designated persons.")

Consistent with these policies, an author's assignment or conveyance of a copyright renewal right "prior to the vesting of that renewal copyright interest in his is a mere expectancy or contingency interest." Broadcast Music, Inc. v. Roger Miller Music, Inc., 396 F.3d 762, 768 (6th Cir. 2005). As a consequence, an author may freely assign his copyright renewal rights during the

17

copyright's original term, but such an assignment is effectuated only if the author is alive at the start of the renewal term. Miller Music Corp. v. Charles N. Daniels, Inc., 362 U.S. 373, 374-75 (1960) ("An assignment by an author of his renewal rights made before the original copyright is valid against the world, if the author is alive at the commencement of the renewal period."). However, if the author dies prior to the vesting of the renewal copyright, the party to whom the author conveyed the renewal copyright has no entitlement to that renewal copyright. Broadcast Music, 396 F.3d at 768-69. "These results follow not because the author's assignment is invalid but because he had only an expectancy to assign; and his death, prior to the renewal period, terminates his interest in the renewal which by [§ 301(a)(1)(c)] vests in the named classes. . . . Until [the renewal period] arrives, assignees of renewal rights take the risk that the rights acquired may never vest in their assignors." Miller Music Corp., 362 U.S. at 376, 378.

Here, it is undisputed that Roger Miller was alive when the copyright renewal rights vested as to the Songs published from 1958 to 1963. See Docket Entry No. 14, Plaintiffs' Memorandum in Support of Summary Judgment at 4. It is further undisputed that Miller died on October 25, 1992, prior to the vesting of the copyright renewal rights for the Songs published in 1964. See Docket Entry No. 11, Sony's Memorandum in Support of Motion for Judgment on the Pleadings at 18. Moreover, Sony does not dispute that by operation of law, the copyright renewal rights reverted to Mary Miller or RMMI upon Miller's death. Id.

Accordingly, the Court must determine: (1) whether Miller validly assigned his copyright renewal rights to Sony for the 1958-63 Songs; (2) if not, whether Sony is liable to Plaintiffs for copyright infringement for its exploitation of these songs; and (3) whether Sony is liable to Plaintiffs for copyright infringement for its exploitation of the 1964 Songs.

18

### a. 1958-63 Songs

As noted above, a copyright owner may freely assign or transfer his renewal copyright interests contingent upon his survival at the onset of the renewal period. Miller Music Corp., 362 U.S. at 374-75. Nevertheless, because copyright renewal terms are distinct estates that can be transferred or retained independently from the original term, "there is a strong presumption against the conveyance of renewal rights." Corcovado Music Corp. v. Hollis Music, Inc., 981 F.2d 679, 684 (2d Cir. 1993). "An assignment or transfer of the copyright in general terms, which makes no mention of the renewal rights, does not assign the renewal term." Yount v. Acuff Rose-Opryland, 103 F.3d 830, 833 (9th Cir. 1996). However, "[u]se of the particular word 'renewal' is not necessary to transfer renewal rights. Transfers using the words 'forever' and 'hereafter', see Corcovado, 981 F.2d at 685, and 'perpetual', P.C. Films Corp. v. MGM/UA Home Video, Inc., 138 F.3d 453, 457 (2d Cir. 1998), have been held to convey the renewal term copyright." Hayes v. Carlin Am., Inc., 168 F. Supp. 2d 154, 157 (S.D.N.Y. 2001).

State contract law, rather than federal law, "determines the rights and obligations asing under a publishing contract that assigns a copyright." Yount, 103 F.3d at 835. The "cardinal rule of contract interpretation" under Tennessee contract law[5] is to ascertain the parties' intent based upon the language in the contract. Guiliano v. Cleo, Inc., 995 S.W.2d 88, 100 n.12 (Tenn. 1999). However, "in construing contracts the Courts not only look to the language of the instrument, but must ascertain, if possible, the intention of the parties, and the construction which is fair and

---

[5] There is no dispute that the Publishing Agreements and other agreements at issue in this action are governed by Tennessee law. See, e.g., Docket Entry No. 1, Complaint at Exhibits 4, 5, 8 and 9 attached thereto (agreements between Miller and Tree each containing a Tennessee choice of law clause).

19

reasonable will prevail." <u>Haren Constr. Co. v. Metro. Gov't of Nashville</u>, 2003 WL 21537623, at *4 (Tenn. Ct. App. July 9, 2003). Moreover, "[t]he overriding purpose of the Court in interpreting [a] contract is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles. . . . The principal apparent purpose of the parties is given great weight in determining the meaning to be given to manifestations of intention or to any part thereof." <u>Hamblen County v. City of Morristown</u>, 656 S.W.2d 331, 334 (Tenn. 1983). In making its determination as to the parties' intent, the Court also "must look to the situation involving the parties, the nature of the business in which they are engaged and the subject matter to which they contract related." <u>Stovall v. Dattel</u>, 619 S.W.2d 125, 127 (Tenn. Ct. App. 1981).

Thus, in the absence of fraud or mistake, an unambiguous written contract must be interpreted and enforced according to its "plain and ordinary popular sense." <u>Bob Pearsall Motors v. Regal Chrysler-Plymouth, Inc.</u>, 521 S.W.2d 578, 580 (Tenn. 1975); <u>see also</u> <u>FDIC v. Armstrong</u>, 784 F.2d 741, 744 (6th Cir. 1986); <u>Cooke County Bd. of Highway Comm'rs v. Newport Utils. Bds.</u>, 690 S.W.2d 231, 237 (Tenn. 1985); <u>Petty v. Sloan</u>, 277 S.W.2d 355, 364 (Tenn. 1955); <u>see also</u> Tenn. Code Ann. § 47-50-112(a) ("All contracts . . . in writing and signed by the party to be bound . . . shall be <u>prima facie</u> evidence that the contract contains the true intention of the parties, and shall be enforced as written . . . ."). A contract is ambiguous only when its meaning is unclear and the contract language may be understood in more ways than one. <u>Empress Health and Beauty Spa, Inc. v. Turner</u>, 503 S.W.2d 188, 190-91 (Tenn. 1973).

Further, a writing may be incorporated by reference into a written contract, thereby requiring both writings to be construed together. <u>McCall v. Towne Square, Inc.</u>, 503 S.W.2d 180, 183 (Tenn. 1973); <u>see also</u> <u>Real Estate Mgmt v. Giles</u>, 293 S.W.2d 596, 599 (Tenn. Ct. App.1956) ("[W]here

20

several instruments are made a part of one transaction, they will be read together and each will be construed with reference to the other."). As with any other contractual provision, an incorporation is binding only if the parties intend to be so bound. See, e.g., White's Elec., Heating, Air & Plumbing v. Lewis Constr. Y Co., 1999 WL 605654, at *13 (Tenn. Ct. App. Aug. 11, 1999).

Here, Miller and Tree executed the 1958, 1960, and 1962 Publishing Agreements that conveyed the original copyrights of the Songs to Tree. (Docket Entry No. 1, Complaint at ¶¶ 8, 10 and 12 and Exhibits 2-4 attached thereto). These Agreements provide, in part:

> 1.     Subject to the terms of this contract, [Miller] hereby sell[s], assign[s], transfer[s] and deliver[s] to [Tree] all musical compositions heretofore written and/or composed by you which have not previously been assigned to publishers other than [Tree] and [Miller] hereby agree[s] to sell, assign, transfer and deliver to [Tree] all musical compositions which [Miller] shall hereafter write during the term of this contract and any extensions and renewals thereof.

> 2.     All rights in and to music and/or lyrics for musical compositions as soon as conceived, composed and/or written by [Miller] during the term of this agreement and any extensions and renewals hereof shall immediately be vested in [Tree] together with the right to copyright the same throughout the world.

Id. at Exhibit 2 attached thereto, 1958 Agreement at ¶¶ 1-2 (emphasis added), Exhibit 3 attached thereto, 1960 Agreement at ¶¶ 1-2 (emphasis added), and Exhibit 4 attached thereto, 1962 Agreement at ¶¶ 1-2 (emphasis added)

These Publishing Agreements require that for each new song delivered by Miller to Tree, Miller was to execute a separate "Exhibit A" agreement wherein Miller agreed "to be bound by [its] terms, covenants and conditions . . . as if herein fully set forth." Id. at Exhibit 2 attached thereto at ¶ 6 (emphasis added), Exhibit 3 attached thereto at ¶ 6 (emphasis added), and Exhibit 4 attached thereto at ¶ 6 (emphasis added). This "Exhibit A" agreement contains the following relevant

21

language:

> 2.   [Miller] hereby sell[s], assign[s], transfer[s] and set[s] over unto [Tree] its successors and assign[s], the said musical composition (lyrics, music and title) and each and every arrangement thereof, together with the world-wide copyright thereof, and the right to secure copyright therein for the entire world, with all of their right, title, and interest, both legal and equitable therein, including but not limited to the sole and exclusive world-wide publications, mechanical electrical reproducing, transcription and motion picture rights and the right of public performance by radio, television, and other means, and all other rights now known or hereafter to come into existence.

> \*   \*   \*

> 5.   [Miller] hereby authorize[s] and empower[s Tree] to renew, pursuant to law, for and in the name of [Miller], if living, the copyright of said musical composition, and to execute and deliver in the name of [Miller] a formal assignment of each renewal copyright to [Tree], for its own use and benefit subject to the payment of the same royalties as hereinbefore provided.

See Docket Entry No. 1, Exhibit 4 attached thereto, Exhibit A at ¶¶ 2, 5 (emphasis added).

There is no dispute that separate "Exhibit A" agreements for new Roger Miller compositions were never executed. (Docket Entry No. 19 at ¶ 14). In 1969, however, "[a]s a matter of convenience for the parties," Miller and Tree entered into a separate agreement providing that:

> [T]he signing of separate agreements is hereby waived, and the terms and conditions as to the royalties and the payments thereof shall be deemed part of the main agreement and shall be made a part thereof. This covers all works heretofore written
> . . . .

(Docket Entry No. 1, Exhibit 6 attached thereto, 1969 Agreement (emphasis added)).

In sum, the Publishing Agreements all refer to the "Exhibit A" agreements to be prepared for each Miller composition, and in particular that the parties agree "to be bound by the terms, covenants and conditions [of the "Exhibit A" agreements] as if herein fully set forth." In these "Exhibit A" agreements, Miller granted Tree, and therefore now grants Sony, the right "to renew,

22

pursuant to law, for and in the name of [Miller], if living, the copyright of said musical composition, and to execute and deliver in the name of [Miller] a formal assignment of each renewal copyright to [Tree] . . . ." Although no "Exhibit A" agreements were ever executed, Miller and Tree agreed that "[a]s a matter of convenience for the parties, the signing of separate agreements is hereby waived, and the terms and conditions as to the royalties and the payment thereof shall be deemed part of the main agreement and shall be made a part thereof. This covers all works heretofore written . . . ."

The Court concludes that, taken together, these agreements evince the intent of Miller to assign to Tree both his original and renewal copyright interests in the Songs in exchange for royalty payments. The Publishing Agreements specifically provide that the parties intend to be bound by the "Exhibit A" agreements "as if herein fully set forth, and in these "Exhibit A" agreements, Miller explicitly assigned his renewal rights to Tree. In 1969, the parties dispensed with the requirement to execute a separate "Exhibit A" agreement, while leaving unchanged the provision in the Publishing Agreements binding the parties to the term of the "Exhibit A" agreements.

Plaintiffs argue that the 1969 waiver was not so expansive, contending instead that it "incorporated only the provisions of Exhibits A pertaining to royalty payments into the original agreements, thereby binding the parties only to those express provisions." (Docket Entry No. 14, Plaintiffs' Memorandum in Support of Summary Judgment at 12-13). In support of this contention, Plaintiffs rely on the language in the 1969 waiver that "the terms and conditions as to the royalties and the payment thereof shall be deemed part of the main agreement and shall be made a part thereof." Accordingly, Plaintiffs argue further that "[h]ad the parties intended to incorporate the renewal provisions of Exhibits A into the . . . Agreements, they could have done so by executing a

23

document similar to the 1969 waiver which incorporated the renewal provision of Exhibits A. They did not." Id. at 13.

The Court finds Plaintiffs' limited reading of the 1969 waiver unpersuasive. First, Plaintiffs' reading of the above clause of the 1969 waiver in isolation ignores the provision in the Publishing Agreements binding the parties to the "Exhibit A" agreements as if they were fully set forth within the body of the Publishing Agreements themselves. In addition, Sony could pay royalties only to the extent it had an interest in the Songs that it could exploit, and the proof shows that Sony exploited and paid Miller, and later his estate, royalties after these songs were renewed. See Docket Entry No. 17, Declaration of Jeffrey D. Smarr at ¶ 4 and Exhibit A attached thereto, Sony audit report. Further, Sony/Tree would have to own the right to the renewal copyrights for the 1958-63 Songs in order to pay Miller his share of royalties, and if Sony/Tree did not renew the copyrights for these Songs, then there would have been no royalties to pay Miller and later the Plaintiffs.

Thus, the Court concludes that the more appropriate reading of the Publishing Agreements and the 1969 waiver, and the parties' course of dealing, is that the parties intended to be bound by the "Exhibit A" agreements in their entirety, without having to execute a separate "Exhibit A" for each Miller composition. This reading is the most reasonable given the plain text of the documents, the context of the agreements and relationship between Miller and Tree, and the parties' respective actions. Accordingly, the Court concludes that Roger Miller validly assigned his renewal copyright interests in the 1958-63 Songs to Tree, and that this assignment vested prior to his death.

### b. 1964 Songs

Under 17 U.S.C. § 304, the renewal copyright interest in a composition reverts to the statutory heirs if the author dies before the renewal period, notwithstanding any agreement to the

24

contrary.

Roger Miller died in October, 1992, and the parties agree that the legal ownership of the renewal copyrights for the 1964 Songs, with a renewal period beginning no earlier than January 1, 1993, passed from Roger Miller to his wife and/or children (and therefore RMMI) upon his death. Compare Docket Entry No. 11, Sony's Memorandum in Support of Judgment on the Pleadings at 18-19, with Docket Entry No. 14, Plaintiffs' Memorandum in Support of Summary Judgment at 15-16. The Court agrees with the parties' that legal ownership of the renewal copyrights for the 1964 Songs vested in Mary Miller and/or Roger Miller's children upon his death.

Plaintiffs claim that legal ownership passed "For example, if a renewal registration is made in the 28th year and the renewal claimant dies following the renewal registration but before the end of the year, the renewal copyright is secured on behalf of that renewal claimant and the 67 years of renewal copyright become a part of that individual's estate." United States Copyright Office Circular 15 ¶ 15,017, at 8039.

Sony contends, however, that its past, current, and future exploitation of the Songs is nevertheless lawful and permitted as Sony is either the beneficial owner of the Songs or an implied non-exclusive licensee of the Songs.

### i. Beneficial Ownership

Under the Copyright Act, "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). In describing what is meant by the term "beneficial owner", the House Committee Reports comments that the term "would include, for

25

example, an author who had parted with legal title to the copyright in exchange for percentage of royalties based on sales or license fees." H.R. Rep. No. 94-1476, at 159 (1976). In the principal case cited by Sony, the Ninth Circuit held that Section 501(b) "indicates an intent to allow every beneficial owner to protect his interests, just in case the legal owner is not doing so. . . . [A]n infringer may well injure those who have rights to royalties . . . [but] holding a royalty interest does not bespeak an interest in the underlying copyright itself – a royalty is simply an interest in receiving money when the owner of the copyright exploits it." Yount v. Acuff Rose-Opryland, 103 F.3d 830, 834 (9th Cir. 1996).

Sony cites Yount and Hayes v. Carlin America, Inc., 168 F. Supp. 2d 154 (S.D.N.Y. 2001) for the proposition that beneficial ownership is conferred by operation of contract law and allows the beneficial owner to enjoy the rights flowing from the copyright irrespective of legal ownership. (Docket Entry No. 11 at 18-22). In Yount, plaintiff co-author of a song entered into a publishing agreement granting the publisher the right to secure a copyright in the song and all rights pertinent to the song, including the renewal copyright interest. Id. at 832. The co-author then assigned his royalty rights under this publishing agreement to the defendants. Id. The Ninth Circuit, faced with the issue of whether the co-author or the third-party was entitled to the royalty payments from the publisher (the legal owner), held that "royalty rights reserved in a contract transferring a copyright are a concern of state contract law only and are not a concern of federal law at all . . . .construction of the assignment of royalty interests is a question of state law," and not federal copyright laws." Id. at 834-35.

Hayes similarly addressed the validity of a royalty right assignment in the face of an infringement claim by a composition's author. Like the Ninth Circuit, the Southern District of New

26

York held that "royalty rights are contract rights (rather than exclusive rights under federal copyright law), and because there is no renewal term for a contract royalty right, whether [singer/songwriter Isaac] Hayes transferred his royalty rights depends on the language of the transfer without reference to the copyright rules governing renewal terms." Hayes v. Carlin Am., Inc., 168 F. Supp. 2d at 158.

Based upon Yount and Hayes, Sony contends that the 1991 Agreement, which granted Tree "the sole and exclusive right . . . throughout the world and in perpetuity . . . the sole and exclusive right to receive any and all benefits, advantages, income, revenues, royalties and fees" from the Songs, confers upon Sony beneficial ownership of the Songs independent of legal ownership. In other words, Sony contends that its exploitation of the Songs is permissible under its 1991 Agreement with Roger Miller.

However, the situation here is quite distinguishable from those cases cited by Sony. Yount and Hayes dealt with situations of beneficial ownership as contemplated by Congress, that is, an author, or an author's contractual transferee, "who had parted with legal title to the copyright in exchange for percentage of royalties based on sales or license fees." Sony is not seeking royalty rights from Plaintiffs' exploitation of the Songs. Thus, in the Court's view, Yount and Hayes are inapplicable to this case.

Upon its reading of Yount and Hayes in the context of the House Committee Report of Congress's definition of "beneficial owner", the Court concludes that Sony cannot be the beneficial owner of the 1964 Songs of which Plaintiffs are the legal owner.

### ii. Implied Non-Exclusive Licensee

Under the Copyright Act, the "transfer of copyright ownership" is defined as "an assignment,

27

mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101 (emphasis added). A non-exclusive license is not a transfer of ownership. Johnson v. Jones, 149 F.3d 494, 500 (6th Cir. 1998). "[I]n the case of an implied nonexclusive license . . . [t]he copyright owner simply permits the use of a copyrighted work in a particular manner." I.A.E., Inc. v. Shaver, 74 F.3d 768, 774 (7th Cir. 1996). The existence of an implied license to use a copyright for a particular purpose precludes a finding of infringement. Johnson, 149 F.3d at 500; accord Shaver, 74 F.3d at 775 ("Although a person holding a nonexclusive license has no standing to sue for copyright infringement, the existence of a license, exclusive or nonexclusive, creates an affirmative defense to a claim of copyright infringement." (internal citation omitted)).

Because a non-exclusive license is not a "transfer of copyright ownership" under the Copyright Act, "a non-exclusive license may be granted orally, or may be implied from conduct." Johnson, 149 F.3d at 500; see also 17 U.S.C. § 204(a) ("A transfer of copyright ownership . . . is not valid unless an instrument of conveyance . . . is in writing and signed by the owner of the rights conveyed . . . ."). Courts have found implied licenses only in "narrow" circumstances where "a person (the licensee requests the creation of the work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." Shaver, 74 F.3d at 776 (quoting Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558-59 (9th Cir. 1990)); Smithkline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc., 211 F.3d 21, 25 (2d Cir. 2000). Moreover, "[i]n certain circumstances, failure by the copyright owner to object to reproduction of copyrighted works may provide the basis for implying a nonexclusive license, but this basis for an implied license is available only when the

28

owner's silence is coupled with knowledge of the copying." Viacom Int'l, Inc. v. Fanzine Int'l, Inc., 2000 WL 1854903, at * 5 (S.D.N.Y. July 12, 2000).

Here, the record demonstrates that Miller and Tree/Sony had a relationship for thirty-four years. Throughout that relationship, Miller agreed to "sell, assign, transfer and deliver to [Tree] all musical compositions heretofore written and/or composed by [him] which have not previously been assigned to publishers other than [Tree] and [Miller] hereby agree[s] to sell, assign, transfer and deliver to [Tree] all musical compositions which [Miller] shall hereafter write during the term of this contract and any extensions and renewals thereof," and that all "renewals hereof shall immediately be vested in [Tree] together with the right to copyright the same throughout the world." (Docket Entry No. 1, Complaint, at Exhibit 2 attached thereto, 1958 Agreement at ¶¶ 1-2, Exhibit 3 attached thereto, 1960 Agreement at ¶¶ 1-2, and Exhibit 4 attached thereto, 1962 Agreement at ¶¶ 1-2). For its part, Tree/Sony was to exploit the Songs and provide Miller a share of the royalty payments. See id. at Exhibit 2 attached thereto at ¶¶ 7, 9, 12; Exhibit 3 attached thereto at ¶¶ 7, 9, 12; and Exhibit 4 attached thereto at ¶¶ 7, 9, 12.

In addition to the Publishing Agreements, Miller and Tree's final agreement provided that:

> . . . Tree shall have the <u>sole and exclusive right to exercise . . . all rights and interests in and to Said Works, throughout the world and in perpetuity,</u> including all copyrights therein, <u>and the sole and exclusive right to receive any and all benefits, advantages, income, revenues, royalties and fees of any and every nature, kind and description whatsoever, derived and derivable, accrued, or which may, might or shall hereafter accrue</u> . . . <u>from any and every use</u> and purpose whatsoever of Said Works or any part thereof <u>and from any and every contract, agreement, right, privilege, grant and license in respect thereof.</u>

Id. at Exhibit 9 attached thereto, 1991 Agreement, at ¶ 4(a) (emphasis added).

This 1991 Agreement grants Tree/Sony "in perpetuity" the sole and exclusive right to use

29

and benefit from the Songs. Indeed, Miller allowed Tree/Sony to enjoy this right after certain of his copyrights were renewed, for which Miller received royalty payments. (Docket Entry No. 17, Jeffrey D. Smarr Affidavit at ¶ 4 and Exhibit A attached thereto, Sony audit report). From these contracts, as well as Miller's own conduct, the record demonstrates that Miller and Tree enjoyed a 34-year relationship in which Miller wrote songs and delivered them to Tree/Sony, who then published and exploited the songs and delivered to Miller royalty payments stemming from that exploitation. This relationship, and the relevant writings and actions by the parties, suggest strongly that Miller intended Tree/Sony to continue to exploit the Songs in perpetuity.

The issue here, however, is whether Plaintiffs, the statutory legal owners of the renewal copyrights in the Songs, have granted Sony an implied non-exclusive license to exploit the Songs by their conduct. Because Plaintiffs have not created any new works for Sony, the three-part test as outlined in Shaver does not provide the Court with much guidance regarding the Plaintiffs. However, since Miller's death, Sony has continued to exploit the Songs and have continued to pay Plaintiffs a percentage of the royalties from Sony's exploitation. (Docket Entry No. 17, Jeffrey D. Smarr Affidavit at ¶ 4 and Exhibit A attached thereto, Sony audit report). Plaintiffs have accepted these royalty payments in the years since Roger Miller's death, and prior to this action have not objected to either these royalties or Sony's exploitation of the Songs.

Thus, the Court concludes that not only did Roger Miller grant Tree/Sony an exclusive license in perpetuity, but Plaintiffs' actions and inactions since Miller's death created in Sony an implied non-exclusive license to exploit the Songs. Accordingly, Sony is not liable for Plaintiffs' claims of infringement from December 21, 2001 to December 21, 2004.

### iii. Legal Ownership of the 1964 Songs

30

An issue remains as to whom the legal ownership of the 1964 Songs actually vested. Under Sony's reading of 17 U.S.C. § 304, the renewal copyright interests flowed to Mary Miller and Roger Miller's children. (Docket Entry No.18 at 20 n.22). Case law reflects Sony's reading. See, e.g., Venegas Hernandez v. Peer Int'l Corp., 270 F. Supp. 2d 207, 214 (D.P.R. 2003) ("Copyright renewal rights do not pass under the usual rules of testamentary or intestate succession, but rather under the provisions of § 304 of the Copyright Act.").

However, Plaintiffs contend that because Roger Miller bequeathed all of his property to his wife, and because the copyright renewal registration for the 1964 Songs occurred prior to Miller's death in the name of Roger Miller, Mary Miller is the sole owner of the renewal copyright interests. In support of their position, Plaintiffs cite a Circular from the United States Copyright Office stating that: "[I]f a renewal registration is made in the 28th year and the renewal claimant dies following the renewal registration but before the end of the year, the renewal copyright is secured on behalf of that renewal claimant and the 67 years of renewal copyright become a part of that individual's estate." United States Copyright Office Circular15 ¶ 15,017, at 8039. Because the copyrights for the 1964 Songs were copyrighted in Roger Miller's name prior to his death, the Court agrees with Plaintiffs that the renewal copyright interests became part of Roger Miller's estate bequeathed to Mary Miller.

The parties dispute whether Mary Miller conveyed any interests she owns in the renewal copyrights to RMMI. Although Plaintiffs admit that "Roger Miller Music, Inc. owns and controls the intellectual property of the late Roger Miller pursuant to assignments from Mary Arnold Miller, widow, and all living children with the exception of Shannon Miller Turner," (Docket Entry No. 1, Complaint at ¶ 7), Plaintiffs later assert that "Mary Miller did not assign, to RMMI, the renewal

31

copyrights that are at issue in this case because she did not know whether or not she owned those copyrights at the time of the assignment." (Docket Entry No. 23, Plaintiffs' Reply Memorandum in Support of Summary Judgment at 10). Sony contends that Plaintiffs' statements in its complaint and in previous court proceedings, see Broadcast Music, Inc. v. Roger Miller Music, Inc., 396 F.3d 762, 764 (6th Cir. 2005), constitute admission that bind Plaintiffs. Curb v. MCA Records, Inc., 898 F. Supp. 586, 590 (M.D. Tenn. 1995).

The contract of assignment between Mary Miller and RMMI is not part of the record in this action. As a consequence, the issue of whether Mary Miller or RMMI are the legal owners of the renewal copyright interests is based upon the construction of an agreement not before the Court. Moreover, resolution of this issue has no bearing on the controversy between Plaintiffs and Sony. Accordingly, the Court will not decide the legal ownership of the renewal copyright interests for the 1964 Songs as between Mary Miller and RMMI. However, in light of Plaintiffs' prayer for a declaratory judgment on the issue of ownership, the Court concludes the most appropriate remedy is to declare Mary Miller the legal owner of these renewal copyright interests pending any assignment interest that may have been obtained by RMMI.

## III. CONCLUSION

For the foregoing reasons, Defendant Sony/ATV Publishing, LLC's motion for judgment on the pleadings (Docket Entry No. 8) should be granted. In addition, the motion for summary judgment of Plaintiffs Roger Miller Music, Inc. and Mary A. Miller (Docket Entry No. 13) should be granted in part. A declaratory judgment should be entered awarding Mary A. Miller legal ownership of the renewal copyright interests of the 1964 Songs pending any assignment thereof Mary Miller may have made to RMMI, but Plaintiffs' motion should otherwise be denied.

32

An appropriate Order is filed herewith.

**ENTERED** this the _____ day of July, 2005.

WILLIAM J. HAYNES, JR.

United States District Judge

Case 3:04-cv-01132   Document 27   Filed 07/11/05   Page 33 of 33 PageID #: 66